## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| Jordan Schwyhart, *on behalf of himself and others similarly situated*, ) ) ) | |
| Plaintiff, ) ) | Case No. 2:15-cv-01175-JEO |
| v. ) ) | **UNOPPOSED** |
| AmSher Collection Services, Inc., ) ) | |
| Defendant. ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF THE PARTIES' CLASS ACTION SETTLEMENT

### Introduction

Following over a year of protracted litigation, and as a result of private mediation before Brad Wash, Esq., Jordan Schwyhart and AmSher Collection Services, Inc. ("AmSher") reached an agreement to resolve this class action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

The TCPA makes it unlawful to use an automatic telephone dialing system ("ATDS") to make a call to a cellular telephone number without the prior express consent of the called party. AmSher denies that it violated the TCPA with respect to Mr. Schwyhart and the putative class members.

The settlement has two primary components: First, the settlement requires AmSher to create a non-reversionary cash settlement fund of $970,000 for the

benefit of the members of the Damages Subclass (defined below). Each participating member of the Damages Subclass will be entitled to his or her *pro rata* share of the settlement fund, less settlement costs, which include the costs of notice and claims administration, attorneys' fees and expenses that this Court may approve, and an incentive award to Mr. Schwyhart that this Court may approve. Participating class members will receive a maximum of $225, and none of the settlement monies will revert back to AmSher.

Separately, and for the benefit of the members of the Injunctive Class (defined below)—a broader class consisting of all persons who received autodialed calls from AmSher on their cellular telephones over a longer time period—the settlement requires AmSher to institute a number of meaningful changes to its business practices to help prevent future autodialed calls to cellular telephones without consent. Importantly, members of the Injunctive Class will not release their individual claims against AmSher.

In light of the risks, uncertainties, burden, and expense associated with continued litigation, and particularly because of the limited monies available to pay class members' claims, this settlement constitutes an excellent result, and this Court should preliminarily approve it. To be sure, AmSher denies the material allegations in Mr. Schwyhart's complaint; disputes that it used an ATDS, without prior express consent, to contact either Mr. Schwyhart or the class members he seeks to represent;

2

contends that Mr. Schwyhart's claims are not amenable to class certification; and denies that Mr. Schwyhart and class members are entitled to damages. Moreover, AmSher—due to its financial condition and limited available insurance—would be unable to withstand a class-wide judgment requiring it to fully compensate all persons it called with an ATDS over the past five years.

In line with the parties' agreement, Mr. Schwyhart respectfully requests that this Court: (1) conditionally certify the settlement classes, (2) conditionally approve the parties' settlement as fair, adequate, reasonable, and within the reasonable range of possible final approval, (3) appoint Mr. Schwyhart as the class representative, (4) appoint Mr. Schwyhart's counsel—Greenwald Davidson Radbil PLLC ("GDR")— as class counsel, (5) approve the notice program proposed by the parties as the best practicable under the circumstances that satisfies due process and Rule 23, (6) set a date for a final approval hearing, and (7) set deadlines for members of the Damages Subclass to submit claims for compensation, and to object to or exclude themselves from the parties' settlement.

## Summary of the Settlement

**I.     The settlement requires AmSher to create a non-reversionary fund in the amount of $970,000 to compensate those persons it called with an ATDS between May 1, 2015 and July 31, 2015.**

This settlement has two main components. First, AmSher agrees to create a non-reversionary cash settlement fund of $970,000, *see* settlement agreement, ¶

1.32, attached to the declaration of Aaron D. Radbil as Exhibit A, to compensate an

estimated 116,000 members, *id.*, ¶ 1.7, of the Damages Subclass:

> The individuals identified in the Damages Class List who, between May 1, 2015 and July 31, 2015, received a telephone call from AmSher to a cellular telephone, or any other service for which the called party was charged, made with equipment alleged to be an automatic telephone dialing system, or allegedly with an artificial or pre-recorded voice, where it is alleged there was no prior express consent to make the call, as identified by AmSher's records.

*Id.*, ¶ 1.10.

To obtain compensation from the settlement fund, members of the Damages

Subclass will need to submit a claim to the settlement administrator[1] via a designated

settlement website or by mail. *Id.* at ¶ 3. Each member of the class who submits a

timely claim will be entitled to his or her *pro rata* share of the settlement fund, less

settlement costs, which include the costs of notice and claims administration,

attorneys' fees and expenses that this Court may approve, and an incentive award to

Mr. Schwyhart that this Court may approve.[2]

Members of the Damages Subclass who do not opt out of the settlement will

provide a release of claims specifically tailored to the practices that give rise to this

---

[1]   Following a competitive bidding process, the parties recommend that the Court appoint KCC Class Action Services LLC ("KCC") as the settlement administrator. *Id.* at ¶ 1.31.

[2]   Prior to the final fairness hearing in this matter, Mr. Schwyhart will ask this Court for an incentive award not to exceed $10,000, and counsel for Mr. Schwyhart will ask this Court for an award of attorneys' fees not to exceed one-third of the settlement fund and the reimbursement of litigation costs and expenses not to exceed $12,000.

matter. In particular, members of the Damages Subclass will release claims under the TCPA and state law equivalents "arising out of or based upon or relating to telephone calls made by AmSher." *Id.* at ¶ 4.2. This release is narrowly tailored *only* to calls made by AmSher (and not third parties) during the applicable class period in alleged violation of the TCPA and state law equivalents. *Id.*

## II.     The settlement requires AmSher to implement a host of changes to its calling practices to limit future autodialed calls without consent.

Second, the settlement requires substantial injunctive relief aimed at preventing future unwanted calls to the cellular telephones of consumers nationwide. To this end, the settlement calls for the certification of a broader Injunctive Class, defined as:

> All individuals who, between July 13, 2011 through and including the date the settlement is preliminarily approved (*i.e.*, the Class Period), were called by AmSher on their cellular telephones, or any other service for which the individual was charged, with equipment alleged to be an automatic telephone dialing system, or allegedly with an artificial or pre-recorded voice, where it is alleged there was no prior express consent to make the call.

*Id.* at ¶ 1.17.

The settlement also requires AmSher to implement a series of specific changes to its calling practices, including:

- Before calling any telephone number, AmSher will use reasonable means to search and scrub all such numbers to determine whether a given number is a cellular number and will keep a record of all such numbers identified as cellular numbers.

- AmSher will not use an ATDS to call any telephone number shown to be assigned to a cellular telephone service unless AmSher has consent from the subscriber, owner or regular user of the cellular phone. Express consent includes any written or verbal consent provided to AmSher, or its client, by the subscriber, owner or regular user of the cellular telephone to be called with an ATDS.

- When obtaining consent directly from the consumer, AmSher will, in a uniform manner, record in its account management system all consent it receives to call a cellular telephone number using an ATDS directly from a consumer, and retain all such documents or records of consent for a period of no less than twelve months. Consent must be confirmed to AmSher by a person representing themselves as the owner or regular user of the cellular telephone number, or a third party authorized to provide such consent.

- Any express consent AmSher obtains and documents will be limited to calls placed, or caused to be placed, by AmSher for purposes of collecting a debt alleged due to one of AmSher's clients.

- AmSher will design and institute a training program devoted to ensuring compliance with the TCPA, including materials describing express consent, the manner in which AmSher can obtain express consent, the manner in which employees must document express consent, and the circumstances under which AmSher may contact an alleged debtor by using an ATDS.

- AmSher also will implement a policy and procedure to assist employees identify and document wrong or reassigned numbers and cease calls requests to cellular telephone numbers.

- AmSher will maintain a compliance manager responsible for, among other things, implementing and overseeing AmSher's TCPA compliance.

- On a quarterly basis, for a period of two years, AmSher will create and store a report outlining its compliance and alleged non-compliance with the TCPA, including all cellular telephone numbers AmSher is alleged to have called with an ATDS without prior express consent. AmSher will make the reports available to Mr. Schwyhart and his counsel upon request.

6

*Id.* at ¶ 2.1.

In exchange for this injunctive relief, Injunctive Class members will waive their right to bring a class action under the TCPA against AmSher arising out of calls made before this Court preliminarily approves the settlement. *Id*. at ¶ 4.1. Injunctive Class members will not, however, release any individual claims they may have against AmSher, which they will be free to pursue in separate litigation. *Id*. Moreover, with certain limited exceptions, AmSher will concede for the purposes of individual lawsuits that Injunctive Class members may bring that it made the calls at issue via an ATDS—a critical, and often contested, element of a TCPA claim. *Id*. at ¶ 2.2.

## Argument

### I.  This Court should preliminarily approve the parties' settlement.

"Under Rule 23(e) of the Federal Rules of Civil Procedure, a class-action settlement may be approved if the settlement is 'fair, reasonable, and adequate.'" *Melanie K. v. Horton*, No. 1:14-CV-710-WSD, 2015 WL 1799808, at *2 (N.D. Ga. Apr. 15, 2015) (quoting Fed. R. Civ. P. 23(e)(2)). "Approval is generally a two-step process in which a . . . determination on the fairness, reasonableness, and adequacy of the proposed settlement terms is reached." *Id*. (internal citation omitted).

"The Court's initial task is to make a preliminary evaluation of the fairness of the settlement before directing that notice be given to the settlement class." *Dalton*

*v. Cardworks Servicing, LLC*, No. CA 09-00563-CB-C, 2010 WL 5341939, at *2 (S.D. Ala. Nov. 19, 2010) (internal citations and quotations omitted). Specifically, "counsel submit the proposed terms of settlement" to the district court so that it can make "a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms[.]" Manual for Complex Litigation § 21.632 (4th ed. 2004); *see also* 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions, § 11.25 (4th ed. 2002). If the district court preliminarily finds that the settlement is fair, adequate, and reasonable, it then "direct[s] the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing." *Id*.

The second step in the process is a final fairness hearing. *See* Manual for Complex Litigation, § 21.633-34; Newberg on Class Actions, § 11.25; *see also, e.g.*, *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980) (explaining that once a district court finds a settlement proposal "within the range of possible approval, the second step in the review process is to conduct a fairness hearing"), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *Hall v. Frederick J. Hanna & Assocs., P.C.*, No. 1:15-cv-03948, 2016 WL 2866081 (N.D. Ga. May 10, 2016).

Of note, the preliminary fairness determination requires only that a district court evaluate whether the settlement was negotiated at arm's-length, and whether it is within the range of possible litigation outcomes such that "probable cause" exists

8

to disseminate notice and begin the formal fairness process. *See* Manual for Complex Litigation, § 21.632; *see also Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006) ("The purpose of the preliminary approval process is to determine whether there is any reason not to notify the class members of the proposed settlement and to proceed with a fairness hearing.").

To this end, "[w]hen examining the fairness, adequacy, and reasonableness of a settlement, the Eleventh Circuit requires a district court to examine a number of factors, including: '(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Waters v. Cook's Pest Control, Inc.*, No. 2:07-cv-00394-LSC, 2012 WL 2923542, at *12 (N.D. Ala. July 17, 2012) (citing *In re CP Ships Ltd. Sec. Litig.*, 578 F.3d 1306, 1317–18 (11th Cir. 2009) (quoting *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984))). The judgment of experienced counsel is also to be considered. *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 691 (N.D. Ga. 2001).

Each of these factors supports the settlement here.

**A. There is no fraud or collusion behind this settlement as the parties negotiated their settlement at arm's-length, and with the assistance of a respected mediator.**

"A settlement reached after a supervised mediation receives a presumption of reasonableness and the absence of collusion." 2 McLaughlin on Class Actions, § 6:7 (8th ed. 2011); *see also In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 662 (S.D. Fla. 2011) ("The Court finds that the Settlement was reached in the absence of collusion, is the product of informed, good-faith, arms'-length negotiations between the parties and their capable and experienced counsel, and was reached with the assistance of a well-qualified and experienced mediator[.]").[3]

Here, the parties negotiated their settlement through a respected mediator, Brad Wash, Esq.[4] Indeed, Mr. Wash—through an all-day, in-person mediation session that the parties attended—was instrumental in resolving this case. Accordingly, there can be no doubt that the parties negotiated their settlement at

---

[3]     *See also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("[A] mediator[ ] . . . helps to ensure that the proceedings were free of collusion and undue pressure."); *Johnson v. Brennan*, No. 10–cv–4712–CM, 2011 WL 1872405, at *1 (S.D.N.Y. May 17, 2011) (The participation of an experienced mediator "reinforces that the Settlement Agreement is non-collusive."); *Sandoval v. Tharaldson Emp. Mgmt., Inc.*, No. EDCV 08-482-VAP(OP), 2010 WL 2486346, at *6 (C.D. Cal. June 15, 2010) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."); *Milliron v. T-Mobile USA, Inc.*, No. 08-4149, 2009 WL 3345762, at *5 (D.N.J. Sept. 14, 2009) ("[T]he participation of an independent mediator in settlement negotiation virtually insures that the negotiations were conducted at arm's length and without collusion between the parties.").

[4]     Mr. Wash "became a certified mediator in 2002. He was formerly of counsel and mediator with Lucas, Petway, Tucker & Wash, P.C. He joined Upchurch Watson White & Max Mediation Group in January 2007 and has now conducted more than 1,000 mediations." http://www.uww-adr.com/biography/brad-wash (last visited Sept. 19, 2016).

arm's-length, and absent fraud or collusion. *See Wilson v. Everbank*, No. 14-CIV-22264, 2016 WL 457011, at *6 (S.D. Fla. Feb. 3, 2016) (finding no evidence of fraud or collusion where the settlement was negotiated at arms' length, and where the mediation was overseen by a nationally renowned mediator).

### B. Mr. Schwyhart faces a variety of legal and factual defenses to his claims, which weigh in favor of settlement.

The Court must also consider "the likelihood and extent of any recovery from the defendants absent . . . settlement." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 314 (N.D. Ga. 1993); *see also Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992) ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise.").

With this in mind, while Mr. Schwyhart strongly believes in his claims, he understands that AmSher asserts a number of potentially case-dispositive defenses. For example, AmSher contends that it had prior express consent to call him and members of the classes. Prior express consent is, of course, a defense to a claim under the TCPA. *See, e.g.*, *Charvat v. Allstate Corp.*, 29 F. Supp. 3d 1147, 1149 (N.D. Ill. 2014) ("[P]rior express consent' under the TCPA 'is an affirmative defense on which the defendant bears the burden of proof[.]'").

AmSher also argues that Mr. Schwyhart would not be able to certify the TCPA class he defines through his class action complaint. In particular, AmSher asserts

that the class Mr. Schwyhart defines in his complaint is unascertainable and individual issues predominate over common questions of law and fact. As AmSher notes, several courts in this Circuit have refused to certify contested TCPA class actions, making the likelihood of certification uncertain. *See, e.g.*, *Shamblin v. Obama for Am.*, No. 8:13-cv-2428-T-33TBM, 2015 WL 1909765, at *8 (M.D. Fla. Apr. 27, 2015); *Balthazor v. Central Credit Servs., Inc.*, No. 07-61822, 2012 WL 6725872, at *3-4 (S.D. Fla. Dec. 27, 2012).

As well, AmSher suggests that a ruling from the D.C. Circuit Court of Appeals in connection with a consolidated appeal of the Federal Communications Commission's July 10, 2015 Declaratory Ruling and Order could negatively affect Mr. Schwyhart's claims should the D.C. Circuit adopt the position that a "called party" under the TCPA refers to the intended recipient of a call, and not the person actually called. This position, if accepted, could not only undercut Mr. Schwyhart's request for relief, but curtail the viability of all "wrong number" claims. AmSher previously requested that this Court stay this matter on these grounds. *See* ECF No. 17.

While Mr. Schwyhart disputes each these defenses, his likelihood of success at trial is far from certain. Accordingly, his decision to settle his claims, and the claims of the members of the class, is reasonable. *See Bennett v. Behring Corp.*, 96 F.R.D. 343, 349-50 (S.D. Fla. 1982) (noting that the plaintiffs faced a "myriad of

factual and legal problems" that led to "great uncertainty as to the fact and amount of damage," which made it "unwise [for the plaintiffs] to risk the substantial benefits which the settlement confers . . . to the vagaries of a trial").

### C. The monetary terms of the parties' settlement fall well within the range of TCPA class action settlements approved by district courts in connection with similar matters.

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." Newberg on Class Actions, § 11:50. This is, in part, because "the law should favor the settlement of controversies, and should not discourage settlement by subjecting a person who has compromised a claim to the hazard of having the settlement proved in a subsequent trial . . . ." *Grady v. de Ville Motor Hotel, Inc.*, 415 F.2d 449, 451 (10th Cir. 1969). It is also, in part, because "[s]ettlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *see also In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 319 ("In assessing the settlement, the Court must determine whether it falls within the range of reasonableness, not whether it is the most favorable possible result in the litigation.") (internal citation omitted).

Here, the parties' resolution to this matter contains two important parts. First, AmSher will create a settlement fund of $970,000, which amounts to approximately $8.36 per member of the Damages Subclass. This figure compares extremely well with similar TCPA class action settlements that courts have recently approved. *See, e.g.*, *Cross v. Wells Fargo Bank, N.A.*, Case 2:15-cv-01270-RWS, 2016 WL 5109533 (N.D. Ga. Sept. 13, 2016) ($4.75 per class member); *Markos v. Wells Fargo Bank, N.A.*, Case No. 1:15-cv-01156-LMM, 2016 WL 4708028 (N.D. Ga. Sept. 7, 2016) ($4.95 per class member); *Picchi v. World Fin. Network Bank*, No. 11-CV-61797-CIV-Altonaga/O'Sullivan (S.D. Fla.) ($2.63 per class member); *Arthur v. Sallie Mae Inc.*, No. 10-cv-00198-JLR (W.D. Wash.) ($3.53 per class member); *Malta v. The Fed. Home Loan Mortg. Corp.*, No. 10-cv-01290-BEN-NLS (S.D. Cal.) ($3.76 per class member); *Duke v. Bank of Am., N.A.*, No. 5:12-cv-04009-EJD (N.D. Cal.) ($4.15 per class member); *Connor v. JPMorgan Chase Bank*, No. 10 CV 1284 DMS BGS (S.D. Cal.) ($4.34 per class member); *Wilkins v. HSBC Bank Nev., N.A.*, No. 14-cv-190 (N.D. Ill.) ($4.41 per class member); *In re Capital One Tel. Consumer Prot. Act Litig.*, No. 12-cv-10064, MDL No. 2416 (N.D. Ill.) ($4.53 per class member).

The cash component of the parties' settlement, therefore, falls within "a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in a particular case and the concomitant risks and costs

necessarily inherent in taking any litigation to completion." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 323; *see also id.* at 326 (a court "should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere probability of relief in the future, after protracted and expensive litigation."). Indeed, "it has been held proper to take the bird in the hand instead of a prospective flock in the bush." *Id.* (internal citation omitted).[5]

Second, and as outlined above, the settlement includes considerable injunctive relief requiring meaningful changes to AmSher's calling practices that should limit future autodialed calls to consumers' cellular telephones without consent. These important business changes underscore the favorable nature of the settlement.

Finally, the $970,000 settlement fund must be evaluated in comparison to what class members could reasonably recover through continued litigation. Here, AmSher is of limited net worth and does not have the resources to fund a considerably larger settlement. In addition, AmSher possesses limited applicable insurance. Thus, financial realities dictate that a larger settlement would have been

---

[5]   In determining whether a settlement is fair in light of the potential range of recovery, important is the maxim that the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate. *See In re Checking Overdraft Litig.*, 830 F. Supp. 2d 1330, 1350 (S.D. Fla. 2011). This is because a settlement must be evaluated in light of the attendant risks associated with litigation. *Id.* In addition, and as noted herein, any potential cash recovery is limited due to AmSher's applicable insurance policy and relatively low net worth.

highly unlikely. *See In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 508 (W.D. Pa. 2003) ("Under these circumstances, even if the Class were to proceed to trial successfully against Rent–Way, it is highly doubtful that the Class would be able to secure a better recovery than that provided by the proposed Settlement. This factor therefore strongly favors approval of the proposed Settlement."); *In re AmeriSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 125 (D.N.J. 2002) ("The Defendants' inability to withstand greater judgment militates in favor of settlement.").

### D. The parties reached their agreement only after being fully apprised of the risks and uncertainties associated with it, and after a year of litigation.

By their very nature, because of the many uncertainties of outcome, difficulties of proof, and lengthy duration, class actions readily lend themselves to compromise. Indeed, "[t]here is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002); *accord In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."). This matter is no exception.

Against this backdrop, courts consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that counsel had an adequate appreciation of the merits of the case before negotiating. *In re Checking Overdraft Litig.*, 830 F. Supp. 2d at 1349 (internal quotation marks omitted). At the

16

same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

Here, the parties entered into their settlement after a year of litigation and only after both parties were fully apprised of the facts, risks, and obstacles involved with continued litigation. In fact, before mediating this matter the parties exchanged documents, conducted third-party discovery, briefed AmSher's motion to stay the case, and briefed for settlement purposes the strengths and weaknesses of their respective positions. As a result, the parties "conducted enough discovery to be able to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation" before negotiating the settlement. *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 669 (M.D. Ala. 1988).

### E. Counsel for Mr. Schwyhart firmly believe the parties' agreement is fair, reasonable, adequate, and in the best interests of class members.

"In a case where experienced counsel represent the class, the Court absent fraud, collusion, or the like, should hesitate to substitute its own judgment for that of counsel." *Ingram*, 200 F.R.D. at 691 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *see also In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 312-13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel.").

Here, Mr. Schwyhart's counsel—whose qualifications include substantial experience as court-appointed class counsel in TCPA class actions—believe the parties' settlement is fair, reasonable, and adequate, and in the best interests of class members. *See, e.g.*, *Cross*, 2016 WL 5109533, at *1 (appointing GDR as co-lead class counsel); *Markos*, 2016 WL 4708028, at *1 (appointing GDR as additional class counsel); *Johnson v. Navient Sols., Inc.*, --- F.R.D. ----, 2016 WL 4069278, at *2 (S.D. Ind. July 27, 2016) (appointing GDR as sole class counsel); *Prater v. Medicredit, Inc.*, No. 14-00159, 2015 WL 8331602, at *2 (E.D. Mo. Dec. 7, 2015) (same); *Jones v. I.Q. Data Int'l, Inc.*, Case 1:14–cv–00130–PJK–GBW, 2015 WL 5704016, at *2 (D.N.M. Sept. 23, 2015) (same); *Ritchie v. Van Ru Credit Corp.*, No. 12-01714, 2014 WL 3955268, at *2 (D. Ariz. Aug. 13, 2014) (same). Mr. Schwyhart's counsel also believe the benefits of the parties' settlement far outweigh the delay and considerable risk of proceeding to trial. *See* Ex. A.

## II. The Damages Subclass satisfies Rule 23(b)(3), and the Injunctive Class satisfies Rule 23(b)(2).

### A. The members of each class are so numerous that joinder of all of them is impracticable.

Rule 23(a) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "In order to satisfy this requirement, [a] plaintiff need not allege the exact number and identity of the class members, but must only establish that joinder is impracticable through some evidence or

reasonable estimate of the number of purported class members." *In re Netbank, Inc.*

*Sec. Litig.*, 259 F.R.D. at 664 (internal citation omitted). And "while there is no fixed

numerosity rule, generally less than twenty-one is inadequate, more than forty

adequate, with numbers between varying according to other factors." *Cox v. Am.*

*Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).

     Here, there are approximately 116,000 members of the Damages Subclass,

and far more members of the Injunctive Class. Joinder, therefore, is impracticable.

*See Dalton*, 2010 WL 5341939, at *4 ("Obviously, joinder of that amount [over

18,000 persons] is impracticable, and, accordingly, the parties have demonstrated

that the Putative Class is sufficiently numerous."). Thus, both classes satisfy Rule

23's numerosity requirement.

### B. Questions of law and fact are common to all class members.

     Rule 23(a) also requires that "there are questions of law or fact common to

the class." Fed. R. Civ. P. 23(a)(2). "A 'common' issue is one that may be proved

through the presentation of generalized proof applicable to the class as a whole." *In*

*re Netbank, Inc. Sec. Litig.*, 259 F.R.D. at 664 (citing *Murray v. Auslander*, 244 F.3d

807, 811 (11th Cir. 2001)). "Rule 23 does not[,] [however,] require that all the

questions of law and fact raised by the dispute be common." *Cox*, 784 F.2d at 1557;

*see also Carriuolo v Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) ("For

purposes of Rule 23(a)(2) even a single common question will do.") (internal quotation marks and alteration omitted).

Here, all class members' claims stem from the same factual circumstances—calls that AmSher placed to cellular telephone numbers, using an ATDS, without prior express consent. Common questions, therefore, include whether AmSher used an ATDS to make the calls at issue, and whether AmSher's calls violate the TCPA. Consequently, the classes satisfy Rule 23's commonality requirement. *See Gehrich v. Chase Bank USA, N.A.*, No. 12 C 5510, 2016 WL 806549, at *4 (N.D. Ill. Mar. 2, 2016) ("The proposed class also satisfies commonality . . . . Each class member suffered roughly the same alleged injury: receipt of at least one phone call or text message from Chase to her cell phone.").[6]

## C. Mr. Schwyhart's claims are typical of the claims of class members.

Under Rule 23(a)(3), the claims or defenses of the representative party must be typical of the class. Fed. R. Civ. P. 23(a)(3). The "typicality" requirement seeks

---

[6]    *See also Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-CV-1290 BEN NLS, 2013 WL 444619, at *2 (S.D. Cal. Feb. 5, 2013) ("Here, the proposed class members' claims stem from the same factual circumstances, in that the calls were made by Wells Fargo to class members . . . using auto-dialing equipment or with a prerecorded voice message. There are also several common questions of law, including: (1) whether Wells Fargo negligently violated the TCPA; (2) whether Wells Fargo willfully or knowingly violated the TCPA; and (3) whether Wells Fargo had 'prior express consent' for the calls."); *Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-CV-01413-W-AJB, 2008 WL 4155361, at *6 (S.D. Cal. Sept. 5, 2008) ("In my judgment, the commonality requirement is met here. The putative class claims stem from the same alleged conduct, *i.e.*, NCO allegedly calling consumers on their cellular telephones, or other wireless devices, without 'prior express consent,' using an 'automatic telephone dialing system' or an 'artificial or prerecorded voice.'").

20

to ensure that a representative plaintiff "possess[es] the same interest and [has] suffer[ed] the same injury shared by all members of the class he represents." *In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. at 665.

Here, AmSher is alleged to have placed calls to Mr. Schwyhart using an ATDS, just as it is alleged to have placed calls to all class members. As a result, Mr. Schwyhart's claims are typical of the claims of the members of the Damages Subclass and of the broader Injunctive Class. *See Gehrich*, 2016 WL 806549, at *4 ("The proposed class also satisfies . . . typicality. Each class member suffered roughly the same alleged injury: receipt of at least one phone call or text message from Chase to her cell phone."); *Bellows*, 2008 WL 4155361, at *6 ("Also, in my judgment, the typicality requirement is met here. Plaintiff alleges that NCO violated the TCPA by calling his cellular telephone, without 'prior express consent,' using an 'automatic telephone dialing system' or an 'artificial or prerecorded voice.' Plaintiff's claims are identical to the claims of the Class Members."); *accord Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 687 (S.D. Fla. 2013) ("The Court also finds that Manno's claims are typical of the TCPA class.").

### D. Mr. Schwyhart and his counsel will fairly and adequately protect the interests of class members.

Rule 23(a)(4) additionally requires that "the representative party must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). A plaintiff and his counsel are adequate if "counsel are qualified, experienced, and

generally able to conduct the proposed litigation," and the "plaintiff[] [does not] have interests antagonistic to those of the rest of the class." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987).

Here, Mr. Schwyhart's claims are aligned with the claims of the members of both classes. He, therefore, has every incentive to vigorously pursue the claims of all class members, as he has done to date by remaining actively involved in this matter since its inception, participating in the discovery process, traveling to and personally attending the mediation in Birmingham, and making strategic decisions in the best interests of class members.

In addition, Mr. Schwyhart retained the services of GDR, which has extensive experience litigating class actions under the TCPA. *See* Ex. A.

### E. The questions of law and fact common to the members of the Damages Subclass predominate over any questions potentially affecting only individual members.

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 634 (1997). "Under Rule 23(b)(3) it is not necessary that all questions of law or fact be common, but only that some questions are common and that they predominate over the individual questions." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004). Indeed, "[p]redominance means that the issues in a class action must be capable of generalized proof such that the issues of

the class predominate over those issues that are subject only to individualized proof." *Gaalswijk-Knetzke v. Receivables Mgmt. Servs. Corp.*, No. 8:08-cv-493, 2008 WL 3850657, at *4 (M.D. Fla. Aug. 14, 2008). Correspondingly, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022; *see also Carriuolo*, 823 F.3d at 985.

Here, the central legal issue affecting class members is whether the calls AmSher placed were made using an ATDS without prior express consent in violation of the TCPA. Additional common questions include whether AmSher used an ATDS as defined by the TCPA, and whether AmSher is liable for "wrong number" calls—that is, whether AmSher violated the TCPA by placing autodialed calls intended for persons from whom it was attempting to collect a debt, but whose phone numbers were reassigned. These common questions predominate over any individual issues. *See Gehrich*, 2016 WL 806549, at *5 ("The common questions listed above are the main questions in this case, they can be resolved on a class-wide basis without any individual variation, and they predominate over any individual issues. The proposed class satisfies Rule 23(b)(3)."); *Malta*, 2013 WL 444619, at *4 ("The central inquiry is whether Wells Fargo violated the TCPA by making calls to the class members. Accordingly, the predominance requirement is met.").

23

**F. A class action is superior to other available methods for the fair and efficient adjudication of Mr. Schwyhart's claims, and the claims of the members of the Damages Subclass.**

Rule 23(b)(3) also requires that a district court determine that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In determining whether the "superiority" requirement is satisfied, a court may consider the following: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3).

Because Mr. Schwyhart seeks to certify the classes in the context of a settlement, this Court need not consider any possible management-related problems as it otherwise would. *See Amchem Prods.*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.").[7]

---

[7]     Even in the non-settlement context, proceeding with TCPA claims on behalf of a class is generally "superior to litigation of the issues by individuals." *Reliable Money Order, Inc. v. McKnight Sales Co.*, 281 F.R.D. 327, 339 (E.D. Wis. 2012); *see also, e.g.*, *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 699 (S.D. Fla. 2015) (certifying a class action under the TCPA, and finding superiority).

In any event, no one member of the Damages Subclass has an interest in controlling the prosecution of this action because Mr. Schwyhart's claims and the claims of the members of the Damages Subclass are the same.

**G. The Injunctive Class meets the requirements of Rule 23(b)(2).**

Under Rule 23(b)(2), certification is appropriate where a defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Here, certification of the Injunctive Class under Rule 23(b)(2) is appropriate because AmSher has acted on grounds that apply generally to all class members via its alleged autodialed calls to cellular telephones, and because the parties have agreed to meaningful injunctive relief that will improve AmSher's calling practices for the benefit of all Injunctive Class members. As such, this Court should certify the Injunctive Class under Rule 23(b)(2). *See Waters*, 2012 WL 2923542, at *12 (Coogler, J.) (certifying class action for settlement purposes, in part, under Rule 23(b)(2) where "[t]he predominant relief requested is a consent decree requiring implementation of new hiring procedures, training programs, and methods of record keeping, as well as the institution of a monitor to oversee the decree.").

**III.    The parties' notice plan satisfies the requirements of Rule 23 and due process requirements.**

Under Rule 23(e), a court must "direct notice in a reasonable manner to all class members who would be bound" by the proposed settlement. Fed. R. Civ. P. 23(e)(1). Notice of a proposed settlement to class members must be the "best notice practicable." *See* Fed. R. Civ. P. 23(c)(2)(B). "[B]est notice practicable" means "individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974).

Accordingly, "[t]he adequacy of class notice is measured by reasonableness," and "[t]he notice must provide the class members with information reasonably necessary to make a decision whether to remain a class member and be bound by the final judgment or opt out of the action." *Roundtree v. Bush Ross, P.A.*, No. 8:14-cv-357-T-37AEP, 2015 WL 5559461, at *1 (M.D. Fla. Sept. 18, 2015) (quoting *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011)).

Here, the parties agreed to a robust notice program to be administered by a well-regarded third-party claims administrator—KCC—with significant experience in the administration of TCPA class actions. With respect to the Damages Subclass, the parties' notice plan includes direct mail notice to all class members with a detachable postcard claim form. In addition, Damages Subclass members can submit claims via a dedicated website. *See* Declaration of KCC, attached as Exhibit B.

26

This notice plan complies with Rule 23 and due process because, among other things, it informs Damages Subclass members of: (1) the nature of the action; (2) the essential terms of the settlement, including the definition of the class and claims asserted; (3) the binding effect of a judgment if the class member does not request exclusion; (4) the process to object to, or to be excluded from, the class, including the time and method for objecting or requesting exclusion and that class members may make an appearance through counsel; (5) information regarding class counsel's request for an award of attorneys' fees and expenses; (6) the procedure for submitting claims to receive settlement benefits; and (7) how to make inquiries and obtain additional information. Fed. R. Civ. P. 23(c)(2)(B); *Roundtree*, 2015 WL 5559461, at *1 ("The class notice provides reasonably adequate information about the nature of the action and the class settlement, and provides sufficient details for class members to determine whether to remain in the class or opt out. Accordingly, the form and content of the class notice are approved.").

The proposed postcard notice with a detachable claim form, and long-form notice to appear on the dedicated settlement website, are attached to the Agreement as Exhibits B and C.

With respect to the Injunctive Class, Rule 23(b)(2) authorizes a no-notice class when final injunctive relief is provided with respect to the class as a whole. *See Jefferson v. Ingersoll Int'l. Inc.*, 195 F.3d 894, 897 (7th Cir. 1999) ("Rule

23(b)(2) authorizes a no-notice and no-opt-out class for 'final injunctive relief ... [that operates] with respect to the class a whole.'"); *Crawford v. Honig*, 37 F.3d 485, 487 n.2 (9th Cir. 1995) (observing that the right to notice does not apply to class actions brought under Rule 23(b)(2)); *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 506 (5th Cir. 1981) (same); *see also Doe v. Bush*, 261 F.3d 1037 (11th Cir. 2001), cert denied, 534 U.S. 1104, 122 S.Ct. 903, 151 L.Ed.2d 872 (2002). ("*Bolton* reaffirmed the holding in *Bing* and also recognized that, as a general matter, a Rule 23(b)(2) class does not require class-wide notice as a precondition for its existence.").

However, while Injunctive Class members will not release any individual claims they may have against AmSher—meaning, Injunctive Class members will retain their substantive rights to file claims against AmSher for violations of the TCPA and state law equivalents—they will waive their right to bring a class action against AmSher over calls they received from AmSher during the class period alleged to be in violation of the TCPA.

As a result, the parties propose a robust publication notice program that, while cost-effective, will advise Injunctive Class members of this settlement and their ability to bring individual claims against AmSher should they desire. *See In Re: Enhanced Recovery Co., Tel. Consumer Prot. Act Litig.*, No. 6:13-md-02398-RBD-

GJK, Doc. 105 (M.D. Fla. Jan. 29, 2015) (approving parties' notice plan in TCPA class actions settlement, which consisted of publication notice).

To this end, notice of this settlement will be published in USA Today, the Montgomery Advertiser, Dothan Eagle, and Birmingham News. In addition, notice will be provided through Google and Facebook advertising designed to reach at least 10 million impressions. *See* Ex. B.

In sum, the parties' notice plan ensures that class members' due process rights are amply protected, is reasonable under the circumstances, and should be approved. *See* Fed. R. Civ. P. 23(c)(2)(A).

## IV.    This Court should schedule a final fairness hearing.

The last step in the settlement approval process is a final approval hearing at which the Court may hear all evidence and argument necessary to make its final settlement evaluation. Fed. R. Civ. P. 23(e)(2). Proponents of the settlement may offer argument in support of final approval. In addition, class members who have properly objected to the settlement may be heard at this hearing. This Court will determine after the final approval hearing whether the settlement should be approved, and whether to enter a judgment and order of dismissal under Rule 23(e).

### Conclusion

Mr. Schwyhart respectfully requests that this Court (1) conditionally certify the settlement class and subclass, (2) conditionally approve the parties' settlement

as fair, adequate, reasonable, and within the reasonable range of possible final approval, (3) appoint Mr. Schwyhart as the class representative, (4) appoint GDR as class counsel, (5) approve the notice program proposed by the parties, and confirm that it is the best practicable under the circumstances and that it satisfies due process and Rule 23, (6) set a date for a final approval hearing, and (7) set deadlines for members of the settlement class to submit claims for compensation, and to object to or exclude themselves from the parties' settlement.

Date: October 10, 2016

GREENWALD DAVIDSON RADBIL PLLC

s/ Michael L. Greenwald
Michael L. Greenwald (*pro hac vice*)
Gina D. Greenwald
5550 Glades Rd., Suite 500
Boca Raton, Florida 33431
Phone: (561) 826-5477
Fax: (561) 961-5684
mgreenwald@gdrlawfirm.com
ggreenwald@gdrlawfirm.com

Aaron D. Radbil (*pro hac vice*)
106 East Sixth Street, Suite 913
Austin, Texas 78701
Phone: (512) 322-3912
Fax: (561) 961-5684
aradbil@gdrlawfirm.com

Counsel for Plaintiff and proposed class counsel

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was file electronically on October 10, 2016, via the Court Clerk's CM/ECF system, which will provide notice to all counsel of record.

s/ Michael L. Greenwald
Michael L. Greenwald